The STATE of Ohio, Appellee,

v.

BONNER, Appellant.

[Cite as *State v. Bonner* (1997), 118 Ohio App.3d 815.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–960198.

Decided March 19, 1997.

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Jennifer E. Day,* Assistant Prosecuting Attorney, for appellee.

*Herbert E. Freeman,* for appellant.

SHANNON, Judge.

This is an appeal from the judgment entered and the sentence imposed pursuant to the verdict of the jury finding the defendant-appellant, Andre Bonner, guilty of aggravated robbery, robbery and theft as he stood charged in the three-count indictment upon which the prosecution proceeded.[1]

The facts are relatively uncomplicated and, in most instances, undisputed. On July 21, 1995, Elmer McCullah left his place of employment shortly after 2:00 p.m. and proceeded to a nearby branch office of the Fifth Third Bank to cash his paycheck. McCullah parked his car in a lot apparently used jointly by the Fifth Third Bank office and an adjacent branch of the Society Bank. He went into the Fifth Third office, received currency in the total of $226, left the bank and returned to his car with the money in hand. McCullah, while seated behind the steering wheel, was placing the currency in his billfold when suddenly Bonner appeared at the open window on McCullah's left side. According to McCullah, Bonner asked for "change for a fifty." The answer was "No. All I have is twenty dollar bills." Mr. McCullah related what then followed:

"At that point in time, he stuck his hand in the car, put a gun to my rib cage. I had the money, like, in my hands. He grabs it, like this, and says, 'Give it up.'

"Q. Okay. What did you do?

"A. I told him, I said no, I wasn't letting loose of my money. And he kind of started tugging with it, kept tugging with it, tugging with it. I wouldn't let it go."

The two continued to struggle over the money while McCullah shouted for help. Suddenly, Bonner drew back his left hand and struck McCullah's right eye with such force that his eyeglasses were knocked from his face to the ground, damaging the frames. Bonner then fled across the parking lot with the gun in hand, leaving McCullah standing beside his car. Bonner stopped his flight momentarily and, in McCullah's words, "looked like he was going to come back at me," while still in possession of the gun. Bonner then turned and disappeared behind the Society Bank building.

When Bonner placed the gun in McCullah's side and reached inside the car for the money, McCullah was able to see the gun clearly but did not know whether it

---

1. Bonner was sentenced to a term of ten to twenty years on count one (aggravated robbery)— count two (robbery) was merged with the first count—and to a term of one and one-half years on the third count (theft). The sentence on the first count is for actual incarceration. The sentence on the third count is to run consecutively to the first. Bonner was credited with two hundred twenty-one days for time served.

was, in reality, an operable firearm. His testimony with respect to the gun was as follows:

"Q. Did you get a good look at the gun?

"A. Yes.

"Q. Can you describe that to the jury for us?

"A. The gun was a little hand-held—I guess you call them revolvers, pistols. It was black. It looked like the paint was chipping off of it, kind of like it was really worn and used.

"Q. Okay. At the time that he had placed the gun at your side, did you know whether or not that gun was real?

"A. No, I did not.

"Q. Okay. Did you question that it may or may not be a real gun?

"A. No, I did not.

"Q. So, basically, you assumed that it was a real gun that the defendant was using?

"A. I could tell by looking at it, using common sense, you know, that, you know, this gun doesn't look real. But that's something that I couldn't say for sure."

Most of what McCullah related in court was witnessed by the manager of the Society Bank branch, Kathy Hargarten. Her first contact with Bonner came at about 1:30 p.m. on July 21 when Bonner came into the bank to ask questions about cashing a check. His actions, *e.g.*, leaning so far over the teller's counter as to place his hands inside the area nearest the teller, aroused her suspicions to the extent that she watched to see where Bonner went when he left her bank. Hargarten saw Bonner approach the Fifth Third office, then turn back through the parking lot and approach an automobile occupied by a man whom she had observed as he left the Fifth Third bank. She saw Bonner put his right hand inside the front window of the car and punch that man in the face with his left hand. As Bonner fled, Hargarten instructed one of her tellers to "call 911" and then brought McCullah into her office to assist him.

A Cincinnati police investigator responded to the "911" call. He testified that one of his duties had been to coordinate police efforts to apprehend the individual who had been robbing citizens at the ATM machine at the Fifth Third Bank location as they used that device to obtain cash. The investigator interviewed McCullah and other witnesses and obtained a description of the man who had robbed McCullah.

A week later, Bonner came into the Society Bank to ask the time of day. He was recognized immediately by Hargarten and other employees. Police were summoned, but Bonner disappeared from the scene before their arrival.

On August 4, again a week later, Hargarten saw Bonner near the entrance to the Fifth Third Bank. She ordered that the doors to her bank be locked and walked to the Fifth Third office to warn its managers of Bonner's presence. Police were called as Bonner began to walk away. Two officers in plain clothes and in an unmarked vehicle were on patrol two city blocks away and responded immediately. They recognized Bonner from information, including photographs of Bonner taken by bank surveillance cameras, in their possession. Those officers called for additional police and a marked vehicle responded. As Bonner watched the marked car, he was some twelve feet in front of the unmarked car and the plainclothes officer saw him "pull a gun from his waistband" and throw it to the ground. It was seized, immediately before Bonner was arrested, by one of the plainclothes officers, who testified:

"Q. Now, what type of gun is it? You are familiar with guns?

"Q. Okay. It is fashioned or modeled against or similar to a make, a type of a real gun?

"A. Yes, it's similar to a .38 revolver. If somebody pointed this at me, I would think it was real."

On August 3, 1996, the day before Bonner's arrest, Irene Redrow, then seventy-eight years of age, a habitual user of the ATM machine at the Fifth Third Bank premises, withdrew currency from it while seated in her car with her passenger-side window open. Redrow had placed the money in her purse, which also held a number of personal items including a Sears credit card, and put the purse on the passenger seat next to her. Suddenly, Bonner appeared at the open passenger-side window and asked, "Do you have change for a twenty?" When the answer was "No, I don't," Bonner reached inside the car, "jerked" the purse out the window and ran away.

Redrow went into the Fifth Third Bank and reported the theft of her purse to the manager, who took a description of the thief and called police, who later interviewed her. Redrow's in-court identification of Bonner was positive and unwavering.

After his arrest on August 4, Bonner was questioned by police. He revealed that he was a juvenile, a fact which the police verified.[2]

---

2. Bonner was bound over to the Hamilton County Grand Jury, after proceedings in the Juvenile Court of Hamilton County, to be tried as an adult. Bonner does not question the regularity of those proceedings in his appeal. However, the first of the series of legal counsel

Bonner entered a plea of not guilty to the charges, and a jury trial ensued. After the prosecution rested its case-in-chief, Bonner's counsel made a motion for acquittal as provided for in Crim.R. 29, and it was overruled. Thereafter, Bonner testified in his own defense.

Bonner testified that on July 21, 1996, he was walking through the parking lot between the banks with his head lowered when he bumped into Elmer McCullah, who was also on foot. He stated that McCullah called him a "stupid black-ass-nigger," an epithet which so angered him that he hit McCullah. After McCullah fell to the ground, Bonner ran away to the home of a friend nearby.

With respect to the incident on August 3 involving Irene Redrow, Bonner said that she drove her car into the parking lot, where Bonner was standing with a friend, at such high speed that she almost struck him. Bonner testified that when he confronted her about how she was driving, he became "upset" because Redrow called him "stupid" and "a nigger." Bonner claimed that when he retorted that Redrow was "even stupider," she began swinging her purse, which then "came out the window" of her car. The purse, Bonner said, was then picked up by a "Caucasian guy" who returned it to Redrow.

Bonner explained his possession of the gun in these words on direct examination:

"Q. What about the one officer that testified that you threw a toy gun away? What's that all about?

"A. Well, that toy gun never got thrown. It fell out my pocket when I was wrestling with the officer.

"Q. Okay. Had you just received that toy gun?

"A. Yes, I did, from a person named Wyman. Wyman was standing across the street, seen everything going over. They just put me in the car and just drove off."

Bonner denied that he had robbed McCullah or that he had stolen Redrow's purse and its contents. He also denied police testimony that during his interrogation after his arrest he had admitted to taking the purse because he was angry and had given it to a white man on the street.

The single assignment of error is:

---

who have represented Bonner in this matter sought and obtained an order from the jurist who presided at the trial that counsel be provided a transcript of the bindover proceedings. That same jurist ordered that this record be supplemented by the transcript. Bonner's trial counsel utilized information in the transcript in defending Bonner, who, it seems clear, suffers from a "behavioral problem" on the basis of which his mother receives federal benefits. Bonner's competence to stand trial is not a question before us. For reasons not apparent in the record certified to us, the transcript of the bindover proceedings has not been made a part of it.

"The trial court erred to the prejudice of the defendant-appellant in that it convicted him of aggravated robbery (count # 1) when he did not use a deadly weapon or dangerous ordnance."

Although appellate counsel's statement that "the trial court erred * * * in that it convicted him" may be misleading to the extent that it may inappropriately signal that it was the court, rather than a jury, that actually found Bonner guilty,[3] it has no bearing upon the resolution of the intrinsic question of whether the gun used by Bonner in the robbery of McCullah was a deadly weapon or dangerous ordnance. The theory upon which the appellant relies is set forth clearly in his counsel's statement of the issue presented for review:

"Where the evidence is undisputed that the defendant-appellant used a toy revolver in the commission of the offense, and where there is no testimony that the article was capable of being used as a bludgeon or that it was used or threatened to be used as a bludgeon, the defendant-appellant cannot be said to have used a deadly weapon."

As Bonner's counsel submits, the evidence is undisputed that the gun involved is a toy, one completely incapable of expelling any sort of projectile. It is before us as an exhibit within the record and appears to be what children call a "cap pistol." Its trigger, however, will not cause the hammer to strike the surface upon which the explosive cap is intended to be placed. Its barrel is almost completely blocked by one of its parts, which binds together the two segments which make up the whole toy. Although the first count of the indictment alleges that when committing the offense on July 21, 1996, the one against Mr. McCullah, Bonner had on his person, or under his control, a "handgun," the prosecutor in her opening statement told the jury that the instrument was a toy gun.

In the charge to the jury, the court said:

"And [the state] must prove that the defendant, committing or attempting to commit a theft offense; to wit, United States currency, or in fleeing immediately thereafter, had on or about his person or under his control a deadly weapon; in this case, a toy gun."

---

3. The notice of appeal was filed by an attorney appointed by the trial court to replace Bonner's trial counsel. That notice was filed on March 19, 1996. On October 4, 1996, Bonner filed a writing captioned "Notice of Substitution of Counsel" in which, through William M. Al'Uqdah as his retained counsel, Bonner released his appointed counsel. We substituted Al'Uqdah for Bonner's appointed counsel but notified both of the hearing of the appeal on its merits. Al'Uqdah argued the issues on Bonner's behalf, although the brief was that which was filed by appointed counsel on August 20, 1996, for his then client. The notice states Bonner's "intention to appeal the judgment and sentence rendered on or about March 12, 1996," and we have elected to consider it to be notice of appeal from Bonner's conviction of all the offenses of which the jury found him to be guilty.

In accordance with our responsibility to consider the totality of the evidence adduced below, we have examined the toy gun before us as Exhibit 10. It appears to be made of pot metal, a form of cast iron of low quality, and has plastic pistol grips and an overall length of five inches. The trigger guard is of a size to admit the index finger of an adult easily. When held in the hand its weight is compatible with the mass of metal from which it is formed.

The question of whether the toy gun is a deadly weapon within the statutory definition was raised in the motion for acquittal made when the prosecution rested its case-in-chief. The court and counsel centered their attention upon R.C. 2923.11(A), which provides:

" 'Deadly weapon' means any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

Bonner's counsel, in context, referred also to R.C. 2923.11(K), which defines dangerous ordnance, but clearly that was not an issue in light of the concession by the state that Exhibit 10 was a toy gun.

With respect to the issue at hand, Bonner's counsel argued:

"But if I just center my argument on those two statutes, there is not a deadly weapon or dangerous ordnance in this case by any stretch of the imagination. So with that in mind, Count 1 should be dismissed."

In the course of the colloquy between bench and bar, the trial judge said in response:

"THE COURT: Well, there is [sic] a couple characteristics of a deadly weapon.

"The first characteristic, is it capable, if it's any device or thing capable of inflicting death.

"Officer Jones did testify that, you know, it could be used as a bludgeon. You can inflict death. It's made out of metal. It has some ways—if it hit somebody, it could break apart, could cut them and open a blood vessel. Or if it was used in the hands of the defendant, he's pretty strong. I think he could have killed somebody, hit them over the head. It was capable of inflicting death. It was not designed to inflict death, but it was, in this case, carried or used as a weapon.

"The second characteristic of deadly weapon, the alternative, an instrument devised or thing adapted for use as a weapon, or something that's carried for a weapon. In this case, it was carried, possessed, or used as weapon. So, you know, I'll leave it up to the jury to decide that."

The question of whether the toy gun was a deadly weapon in light of the totality of the evidence in the case was submitted to the jury as a question of fact. The court charged the jury:

"Deadly weapon is any instrument, device, or thing capable of inflicting death and designed or specifically adapted for use as a weapon or possessed, carried, or used as a weapon.

"A little more detail. A deadly weapon is any instrument, device, or thing which has two characteristics. The first characteristic is that it's capable of inflicting or causing death. And the second characteristic is that, in the alternative, either the instrument, device or thing was designed or specifically adapted for use as a weapon, such as a gun, a knife, or brass knuckles or billy club, or it was possessed, carried or used in this case as a weapon. And these are questions of fact for you to determine."

Before the jury retired to deliberate, the court entered into a sidebar discussion with counsel. Bonner's counsel objected to, *inter alia*, the court's "definition of a deadly weapon," arguing that the court's "use of the words toy gun infers a deadly weapon." The court rejected a request to instruct the jury that it had "basically amended the indictment" by employing the words "toy gun." The court expressed its reasons for refusing to expand the charge in these words:

"Right. In fact, I put in there that that was a toy gun. I didn't call it a dangerous ordnance. I didn't call it a handgun.

"A handgun was what appeared in the indictment; why, I don't know, but handgun was alleged in the indictment, along with dangerous ordnance. I don't know why.

"So, essentially, the Court has amended that. And clearly they gave you notice of it, because you knew all along it wasn't a real gun, so nobody was surprised. And the issue becomes whether it's a deadly weapon, based on the fact that it could inflict death and it was used as a weapon or possessed or carried as a weapon. That's the issue in the case. And clearly, it is not a handgun or a dangerous ordnance, so I've already determined that and essentially modified the indictment, amended it according to the evidence, which I'm allowed to. And there was no prejudice to you, because you knew all along it wasn't a real handgun. I'm surprised the indictment did have that in there; that's why I changed it and gave instructions on that deadly weapon, and I did put in there 'to wit, a toy gun.' "

Against this procedural, factual and legal backdrop, we turn to Bonner's assignment of error. While the first issue, whether the court erred in overruling the motion for acquittal made when the prosecution rested its case-in-chief, is not stated precisely, it is one we have chosen to address.

Crim.R. 29(A) provides:

"Motion for judgment of acquittal. The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case."

In *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, the Ohio Supreme Court has given us the test to be applied by a court when ruling upon a motion for acquittal:

"Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *Id.* at syllabus.

We hold that where, as here, an accused admits an assault consisting of a blow to the face of his victim of sufficient force to knock eyeglasses from the victim's face and damage them, followed by a second belligerent approach by the accused to the victim, all while the accused has in hand, and under his control, a metal object capable of being used as a bludgeon, a court does not err in overruling a motion for acquittal, because reasonable minds can reach different conclusions as to whether the metal object is a deadly weapon as defined by law. For us to hold otherwise would require us to rule that, as a matter of law, upon the state of the evidence as it existed, when construed in the light most favorable to the prosecution, the toy gun was not a deadly weapon. Such a holding would be untenable, and accordingly, we conclude that the trial court did not err in submitting the question to the jury as one of fact.

This brings us to the second branch of the assignment, which involves an issue raised subliminally: was the verdict of the jury with respect to the aggravated robbery asserted in the first count of the indictment contrary to the manifest weight of the evidence? Assuming that Bonner's assignment does encompass that question, we answer it in the negative on the authority of *State v. Barnes* (1986), 25 Ohio St.3d 203, 209, 25 OBR 266, 271, 495 N.E.2d 922, 927, wherein the Ohio Supreme Court held:

"In a criminal case a verdict can not be said as a matter of law to be manifestly against the weight or sufficiency of the evidence, where substantial evidence is offered by the state in support of all of the elements of the offenses charged, and if such evidence was of sufficient probative value to sustain a conviction, the reviewing court will not reverse on the sufficiency or weight of evidence. See *State v. Shively* (1961), 172 Ohio St. 128 [15 O.O.2d 211, 174 N.E.2d 104]; *State v.*

*DeHass* (1967), 10 Ohio St.2d 230 [39 O.O.2d 366, 227 N.E.2d 212]; and *State v. Black* (1978), 54 Ohio St.2d 304, 308 [8 O.O.3d 296, 297–298, 376 N.E.2d 948, 951]." See, also, *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

Moreover, we have assessed the latter branch of the assignment in light of the holdings in *Tibbs v. Florida* (1982), 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652, and *State v. Martin* (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717, where this court gave the standard of review for a claim that a conviction is against the manifest weight of the evidence in these words:

"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 175, 20 OBR at 219, 485 N.E.2d at 720–721.

In sum, for the reasons given, the assignment of error, in all of its aspects apparent to us, is not well taken and is overruled. The judgment of the Hamilton County Court of Common Pleas is affirmed.

*Judgment affirmed.*

GORMAN, J., concurs.

MARIANNA BROWN BETTMAN, P.J., dissents.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.

MARIANNA BROWN BETTMAN, Presiding Judge, dissenting.

I can accept the fact that in certain circumstances a toy gun could be a deadly weapon, as statutorily defined in R.C. 2923.11(A), but this is not such a case. The record in this case uncontrovertedly establishes that the small toy gun was not used as a bludgeon, and to me, the testimony of the police officer that such a gun could be used as a bludgeon does not satisfy the elements required by the statute. I believe, therefore, that in the absence of any evidence that appellant actually used the toy gun as a bludgeon, the evidence is insufficient in law to sustain a conviction for aggravated robbery. I would sustain the sole assignment of error. See, generally, *State v. Luckey* (App. 1974), 69 O.O.2d 111, 322 N.E.2d 354 (interpreting earlier statute, but indicating result would be the same under present one); *State v. Deboe* (1977), 62 Ohio App.2d 192, 16 O.O.3d 467, 406 N.E.2d 536; *State v. McKnight* (Feb. 5, 1996), Stark App. No. 1995CA00241,

unreported, 1996 WL 74083 (Gwin, P.J., dissenting); *State v. Nelson* (Aug. 18, 1995), Montgomery App. No. 14775, unreported, 1995 WL 491084 (adopting this analysis but affirming conviction for aggravated robbery on other grounds).